# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **HON. MARK FALK** |
| v. | : | Mag. No. 10-3683 (MF) |
| JOSEPH SUAREZ and KATHERINE FERRO | : | **CRIMINAL COMPLAINT** |

I, Myrna I. Williams, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From at least as early as in or about January 2007 through in or about November 2010, in Bergen County, in the District of New Jersey and elsewhere, defendants JOSEPH SUAREZ and KATHERINE FERRO did:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Myrna I. Williams, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
November 22, 2010 in Essex County, New Jersey

_____
Signature of Judicial Officer

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

From at least as early as in or about January 2007 through in or about November 2010, in Bergen County, in the District of New Jersey and elsewhere, defendants

### JOSEPH SUAREZ and
### KATHERINE FERRO

did knowingly and intentionally conspire and agree with each other and with others, to execute a scheme and artifice to defraud investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing this scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, including, among others, a wire in the amount of approximately $100,000 transmitted from a New Jersey bank account to a Florida bank account controlled by defendants SUAREZ and FERRO, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349 and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Myrna I. Williams, am a Special Agent of the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement agents, and my review of reports, documents, and items of evidence. Where statements of others are related herein, they are related in substance and part. Since this complaint is being submitted for the limited purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not included each and every fact known by the government concerning this investigation.

### Summary of the Investigation

1. At all times relevant to this complaint:

   a. Defendant JOSEPH SUAREZ ("SUAREZ") resided in or around Woodcliff Lake, New Jersey, and operated businesses including Suarez Investment and Development, LLC, for which he served as an officer.

   b. Defendant KATHERINE FERRO ("FERRO") resided in Miami, Florida, and operated the Law Office of Katherine Ferro, P.A. In or about August 2009, FERRO was disbarred from the practice of law by the Supreme Court of Florida.

   c. T.C. resided in or around Upper Saddle River, New Jersey, and was a classmate and friend of SUAREZ's son, J.S. T.C. invested approximately $450,000 of his own money and the money of certain family members and friends with SUAREZ and FERRO.

   d. Advanced Capitol Commercial Group, Inc. ("ACCG") was a New York corporation with offices in Smithtown, New York, that operated, among other things, investment management services for clients.

   e. M.S. resided in or around Farmingdale, New York, and was a client of ACCG who invested approximately $250,000 with SUAREZ and FERRO through ACCG.

   f. A.P. resided in or around Northport, New York, and was a client of ACCG who invested approximately $250,000 with SUAREZ and FERRO through ACCG.

2. Between in or about January 2007 through in or about November 2010, SUAREZ and FERRO conspired with each other and others to use false representations and other fraudulent means to induce at least ten victims to invest an aggregate of approximately $1 million dollars into various fraudulent schemes, including a credit card factoring scheme and a scheme to purchase and resell foreign D2 diesel fuel. After their victims transferred money into accounts controlled by SUAREZ and FERRO, SUAREZ and FERRO transferred that money to other accounts they controlled and/or otherwise depleted those funds for their personal use, contrary to their promises to repay the defrauded investors.

## The Credit Card Factoring Scheme

3.  In or about December 2006, SUAREZ began to mentor T.C. after T.C.'s father died. As time passed, T.C. grew to trust and admire SUAREZ. T.C. was particularly impressed by SUAREZ's business activities and SUAREZ's apparent success in business and financial matters.

4.  A short time after T.C.'s father died, T.C. received certain insurance and other payments that T.C. wished to invest. In or about March 2008, SUAREZ invited T.C. to invest in a credit card factoring venture. SUAREZ advised T.C. that SUAREZ was working with a business associate to provide $100,000 loans to small businesses which accepted payments from customers using credit cards. SUAREZ told T.C. that many small businesses could not qualify for traditional bank loans and would often agree to accept a loan from a credit card factoring venture and pay the loan back with a certain percentage of future credit card transactions. SUAREZ told T.C. that SUSAREZ had invested in this venture himself and suggested that T.C. consider investing in the venture. SUAREZ promised T.C. that T.C. would receive quarterly interest payments of $4,000 on a $100,000 investment and promised T.C. that T.C. would recover his entire $100,000 principal investment at the end of one year.

5.  On or about March 17, 2008, at SUAREZ's instruction, T.C. wired $100,000 to a Wachovia Bank account, in Woodcliff Lake, New Jersey, registered to SUAREZ's wife, E.S. (the "E.S. Account"). SUAREZ and T.C. executed a promissory note that memorialized T.C.'s investment and the repayment terms. E.S. signed the promissory note as a witness. Relying on his close relationship with SUAREZ, T.C. did not retain counsel to review the promissory note or the investment plan SUAREZ present to T.C.

6.  In or about July 2008, SUAREZ paid T.C. approximately $4,000 in cash, in satisfaction of the first quarterly interest payment SUAREZ had promised T.C. In or about October 2008, when the second quarterly interest payment was due, SUAREZ did not pay T.C. Instead, SUAREZ invited T.C. to make an additional investment in another credit card factoring venture.

7.  Between on or about March 17, 2008 and on or about January 27, 2009, T.C. wired approximately $225,000 to accounts controlled by SUAREZ (the "Credit Card Factoring Wires"). Specifically, between on or about March 17, 2008 and on or about October 9, 2008, T.C. wired approximately $175,000 from his own account and an account controlled by his mother, K.C., into the E.S. Account. On or about January 27, 2009, T.C. wired approximately $50,000 into a Bank of America account, in Tampa, Florida, controlled by SUAREZ but registered to E.S. and J.S. (the "Joint Suarez Account"). Days after the Credit Card Factoring Wires, SUAREZ and E.S. withdrew funds from the E.S. Account and the Joint Suarez Account and otherwise depleted the money for personal use. For example: (i) on or about March 19, 2008, a debit was charged to the E.S. Account by Land Rover in the amount of approximately $2,674; (ii) on or about March 25, 2008, a debit was charged to the E.S. Account by Bryant University, where J.S. is a student, in the amount of approximately $19,710; and (iii) between on or about March 17, 2008 and in or about January 27, 2009, SUAREZ and/or E.S. withdrew more

than approximately $108,000 from the E.S. Account and the Joint Suarez Account in the form of cash withdrawals and checks written for cash.

8. The accounts into which the Credit Card Factoring Wires were deposited did not have sufficient funds to cover the debits against them without T.C.'s money. Specifically, in the approximate 30-day period immediately following T.C.'s transfer of approximately $100,000 into the E.S. Account, on or about March 17, 2008, SUAREZ and E.S. depleted approximately $105,000 from the E.S. Account and deposited from other sources approximately $6,500 into the E.S. Account. In the approximate 30-day period immediately following T.C.'s transfer of approximately $75,000 from an account controlled by K.C. into the E.S. Account, on or about October 9, 2008, SUAREZ and E.S. depleted approximately $83,500 from the E.S. Account and made no deposits from any other sources into the E.S. Account. In the approximate 30-day period immediately following T.C.'s transfer of approximately $50,000 into the Joint Suarez Account, on or about January 27, 2009, SUAREZ and E.S. depleted approximately $53,500 from the Joint Suarez Account and deposited from other sources approximately $800 into the Joint Suarez Account.

**The D2 Diesel Purchase and Sale Scheme**

9. In or about early 2009, SUAREZ urged T.C. to consider investing in the purchase and sale of large volumes of foreign D2 diesel fuel (the "D2 Investment Plan"). SUAREZ told T.C. that T.C.'s investment in the D2 Investment Plan would earn interest at an annual rate of 50%, and that SUAREZ would begin paying T.C. interest within forty-five days. SUAREZ also described the D2 Investment Plan to T.C. as an exclusive, "friends and family," investment opportunity and urged T.C. to recruit others to invest, including T.C.'s friends. Based on Suarez's representations, T.C. persuaded several others to invest, through T.C., in the D2 Investment Plan.

10. In or about March 2009, T.C. traveled to Florida with SUAREZ and others, where among other things, T.C. had dinner with SUAREZ, FERRO, and others. During the meal, FERRO spoke to T.C. about the D2 Investment Plan and the opportunity it represented for potential investors. Later, in or about April 2009, FERRO told T.C. that FERRO would speak to any of the prospective investors to whom T.C. presented the D2 Investment Plan, to help explain the plan and convince the prospective investors to invest. FERRO told T.C. that the money T.C. invested and the money T.C. raised from other investors would not be transferred out of FERRO's attorney trust account without T.C.'s permission. FERRO also told T.C. that if the D2 Investment Plan did not yield the results she expected, FERRO would return T.C.'s money and the money T.C. raised from other investors.

11. Between on or about May 19, 2009 and on or about May 26, 2009, T.C. wired approximately $222,000 to an attorney trust account at a Bank of America, in Tampa, Florida, registered to FERRO (the "Ferro Trust Account"). During the same time period, FERRO disposed of nearly all of the $222,000 T.C. wired into the FERRO Trust Account by transferring large amounts into other accounts, including: (i) a wire transfer to an account registered to K.C.G. in the amount of approximately $83,500, on or about May 19, 2009; (ii) a wire transfer

into an account registered to A.D. in the amount of approximately $14,500, on or about May 20, 2009; (iii) a wire transfer into a trust account registered to G.S. in the amount of approximately $109,000, on or about May 22, 2010; and (iv) a wire transfer into another account at Bank of America, in Tampa, Florida, registered to FERRO's law office (the "Ferro Law Firm Account"), in the amount of approximately $11,850. Later, FERRO wired approximately $10,000 to Bryant University from the Ferro Law Firm Account. Between on or about May 1, 2009, through on or about May 31, 2009, approximately $467,300 was deposited into the Ferro Trust Account and approximately $469,000 was withdrawn from the Ferro Trust Account, leaving a negative balance.

12. On or about July 15, 2009, when the first payment on the money T.C. had raised and invested in the D2 Investment Plan became due, SUAREZ told T.C. that SUAREZ was forced to extend the investment period for a week but promised that SUAREZ would pay T.C. the following week. Later, SUAREZ told T.C. that the D2 Investment Plan had been successful but that SUAREZ's bank was preventing SUAREZ from repaying investors because the bank was concerned about, and being careful with, the large amount of money in SUAREZ's account, which SUAREZ falsely said was approximately $28,000,000. In or about December 2009, SUAREZ told T.C. that the D2 Investment Plan repayment money was in SUAREZ's accountant's bank account but that SUAREZ's accountant could not withdraw the funds until January 2010. Later, SUAREZ told T.C. that SUAREZ had lost contact with SUAREZ's accountant.

13. Several months later, SUAREZ told T.C. that the D2 Investment Plan repayment money was being held in FERRO's attorney trust account. Thereafter, T.C. discovered that FERRO had been disbarred from the Florida Bar. When T.C. confronted SUAREZ with FERRO's disbarment, SUAREZ told T.C. that FERRO had not been disbarred but, rather, that FERRO had given up her law license to join SUAREZ in operating the D2 Investment Plan.

14. Law enforcement agents have confirmed that on or about August 3, 2009, FERRO signed an "Unconditional Guilty Plea and Disbarment On Consent" agreement, in which she admitted: (i) issuing at least three checks from her attorney trust account that were returned due to insufficient funds; (ii) failing to preserve client funds in accordance with the requirements of the Florida Bar; (iii) using monies in her trust account for personal use without the consent or knowledge of her clients; and (iv) that her conduct violated Rule 4-8.4(c) of the Rules Regulating the Florida Bar (prohibiting lawyers from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and Rule 5-1.1 of the Rules Regulating Trust Accounts. On or about September 3, 2009, the Supreme Court of Florida issued an Order memorializing FERRO's unconditional guilty plea and disbarment on consent from the Florida Bar for a period of five years.

15. In or about September 2009, SUAREZ told T.C. that SUAREZ was prepared to make large payments to T.C. and the investors T.C. had recruited to invest in the D2 Investment Plan. At SUAREZ's instruction, T.C. visited SUAREZ's home and picked up three checks from E.S., which were drawn on an account in E.S.'s name. The three checks were in the amounts of approximately $118,000, approximately $120,000, and approximately $13,000. All three checks

4

were returned because of insufficient funds in the account. Law enforcement agents later learned that the account on which the checks had been drawn had been closed before the checks were even written.

16. Between in or about June 2009 and November 3, 2010, SUAREZ paid T.C. several payments aggregating less than approximately $50,000, which SUAREZ offered as partial repayment of T.C.'s investments with SUAREZ. During that period, SUAREZ consistently promised to repay T.C. the remainder of the approximately $450,000 that T.C. invested with SUAREZ between in or about March 2008 and in or about June 2009, together with the interest SUAREZ promised T.C., but SUAREZ failed to do so.

**Additional Victims of the D2 Diesel Purchase and Sale Scheme**

17. Law enforcement agents have learned that SUAREZ persuaded other victims to invest in the D2 Investment Plan, including M.S. and A.P., who invested an aggregate of approximately $500,000 with SUAREZ.

18. Specifically, on or about June 12, 2009, ACCG, through its attorneys, wired approximately $500,000 in investment funds, contributed to ACCG by M.S. and A.P., into the Ferro Trust Account, pursuant to an escrow agreement, dated June 11, 2009, between ACCG and FERRO (the "ACCG Escrow Agreement"), who served as the escrow agent for SUAREZ. The terms of the ACCG Escrow Agreement stated, among other things, that FERRO would not remove or transfer ACCG's $500,000 investment from the Ferro Trust Account without the express written consent of ACCG. The ACCG Escrow Agreement also stated, among other things that: (i) ACCG's $500,000 investment would not be used to pay for any products associated with the D2 Investment Plan; (ii) ACCG's investment would remain in the FERRO Trust Account for the duration of the D2 Investment Plan transaction period; (iii) ACCG's $500,000 investment would not be "encumbered, pledged, or hypothecated in any manner"; and (iv) ACCG's $500,000 investment would be refunded in full if the D2 Investment Plan transaction did not close within 30 days of the execution of the ACCG Escrow Agreement.

19. On or about June 1, 2009, the Ferro Trust Account was overdrawn in the amount of approximately $1,650. After receiving ACCG's $500,000 wire deposit on or about June 12, 2009, FERRO transferred substantially all of the ACCG $500,000 deposit from the Ferro Trust Account to the Ferro Law Firm Account. Specifically, between on or about June 12, 2009, and on or about June 18, 2009, FERRO withdrew approximately more than $9,000 in cash from the Ferro Trust Account and transferred approximately $489,000 from the Ferro Trust Account to the Ferro Law Firm Account. Thereafter, between on or about June 12, 2009, and on or about June 25, 2009, FERRO withdrew funds from the Ferro Law Firm Account and otherwise depleted the money for personal use. For example, (i) on or about June 12, 2009, FERRO transferred approximately $127,000 to an account registered to K.C.G.; (ii) on or about June 15, 2009, FERRO transferred approximately $250,000 to an account registered to a purported entity in Spain, (iii) between June 12, 2009, and June 23, 2009, FERRO transferred approximately $64,000 to the Joint Suarez Account; (iv) on or about June 25, 2009, FERRO used a check card associated with the Ferro Law Firm Account to make a payment of approximately $1,500 to

Capital One Auto Finance; and (v) between on or about June 12, 2009, and on or about June 23, 2009, FERRO withdrew from the Ferro Law Firm Account, or transferred into a personal account, approximately $26,000.

20.    On or about August 14, 2009, FERRO informed ACCG's attorneys, in writing, that FERRO intended to return ACCG's $500,000 investment to ACCG on or about August 17, 2009, and would no longer serve as the escrow agent for SUAREZ in the D2 Investment Plan. FERRO did not repay ACCG.